No. 17-1037

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

IAN CURRAN LYONS,

Plaintiff-Appellant,

v.

THE JOHN HOPKINS HOSPITAL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the District of Maryland

_____

## BRIEF OF APPELLANT IAN LYONS

_____

Lisa Bender
   Student counsel
Anna Deffebach
   Student counsel
Hali Kerr
   Student counsel

Wyatt G. Sassman
Brian Wolfman
Georgetown Law Appellate
   Courts Immersion Clinic
600 New Jersey Ave., NW
Washington, D.C. 20001
(202) 661-6746
wyatt.sassman@georgetown.edu

*Counsel for Appellant*

May 8, 2017

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  17-1037        Caption:  Ian Curran Lyons v. The Johns Hopkins Hospital

Pursuant to FRAP 26.1 and Local Rule 26.1,

Ian Curran Lyons
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                           ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                               ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Wyatt G. Sassman                    Date: _____05/08/2017_____

Counsel for: Ian Curran Lyons

# CERTIFICATE OF SERVICE
**************************

I certify that on _____05/08/2017_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Wyatt G. Sassman                              05/08/2017
      (signature)                                    (date)

- ii -

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES ...........................................................v

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF ISSUES .............................................................1

STATEMENT OF THE CASE ........................................................2

   I. Legal background.................................................................2

   II. Factual background ............................................................4

      A. Lyons' disability .........................................................5

      B. Lyons' employment with Johns Hopkins............................6

      C. Lyons' first requests for an accommodation in November and December 2012 .....................................................7

      D. Lyons' treatment..........................................................9

      E. Lyons makes additional requests for accommodations, and Johns Hopkins fires him. ....................................................9

        1. Johns Hopkins extends Lyons' medical leave. ................10

        2. Hopkins discusses firing Lyons. .......................................10

        3. Lyons again requests reasonable accommodations under the ADA. ...........12

        4. Johns Hopkins fires Lyons...........................................12

      F. Heneberry submits a complaint about Lyons to the licensing board. .............13

   III. Procedural background ...........................................................14

SUMMARY OF ARGUMENT............................................................16

ARGUMENT ..................................................................................................18

Standard of Review ...................................................................................18

I. Lyons is a "qualified individual" under the ADA who has established disputes
of fact regarding whether Johns Hopkins discriminated against him
on the basis of his disability. .....................................................................19

A. Lyons was a qualified individual under the Act each time he requested
accommodations. ....................................................................................19

1.   Johns Hopkins did not act "on the basis of" Lyons' drug use. ...................20

2.   Lyons was not "currently engaging in the use of drugs" when Hopkins
failed to accommodate him. ....................................................................22

3.   Lyons fell within the exception's safe-harbor provisions. ...........................26

B. There are disputes of fact about whether Johns Hopkins discriminated
against Lyons. .........................................................................................28

II. Lyons has exhausted his two retaliation claims, and there are disputes
of fact on those claims. .............................................................................31

A.   Lyons exhausted his first retaliation claim that Hopkins terminated him in
retaliation for protected activity. .............................................................31

B. Lyons exhausted his second retaliation claim that Hopkins submitted a
complaint about Lyons to the Maryland Board of Social Work Examiners
in retaliation for protected activity. ........................................................37

C. Lyons has demonstrated disputes of fact regarding whether Hopkins'
reasons for its actions were pretext for retaliation. ..................................41

CONCLUSION ..............................................................................................47

REQUEST FOR ORAL ARGUMENT................................................................

CERTIFICATE OF COMPLIANCE..................................................................

STATUTORY ADDENDUM ..........................................................................1A

# TABLE OF AUTHORITIES

## Cases

*Adkins v. Coventry Health Care, Inc.,*
    172 Fed. App'x 19 (4th Cir. 2006) .................................................23

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................19

*Bowers v. NCAA,*
    475 F.3d 524 (3d Cir. 2007) .................................................. 19-20

*Balas v. Huntington Ingalls Indus., Inc.,*
    711 F.3d 401 (4th Cir. 2013) ......................................................35

*Baustian v. Louisiana,*
    1997 WL 73790 (5th Cir. Feb. 10, 1997) ......................................25

*Carrozza v. Howard County,*
    1995 WL 8033 (4th Cir. Jan. 10, 1995)................................... 23-24

*Chacko v. Patuxent Inst.,*
    429 F.3d 505 (4th Cir. 2005) ...........................................31, 32, 37

*Chisholm v. U.S. Postal Serv.,*
    665 F.2d 482 (4th Cir. 1981) ......................................................37

*Conkel v. Van Pelt,*
    1988 WL 83318 (4th Cir. Aug. 2, 1988) ......................................23

*EEOC v. Sears Roebuck & Co.,*
    243 F.3d 846 (4th Cir. 2001) ................................................ 44, 45

*Evans v. Techs. Applications & Serv. Co.,*
    80 F.3d 954 (4th Cir. 1996) ........................................................18

*Fed. Express Corp. v. Holowecki,*
    552 U.S. 389 (2008) .................................................................32

*Foster v. Univ. of Md.–E. Shore*,
   787 F.3d 243 (4th Cir. 2015) .................................................... 19, 41, 42, 44

*Fox v. Gen. Motors Corp.*,
   247 F.3d 169 (4th Cir. 2001) .................................................................31

*Fox v. Leland Volunteer Fire/Rescue Dep't, Inc.*,
   648 F. App'x 290 (4th Cir. 2016) ..........................................................45

*Hentosh v. Old Dominion Univ.*,
   767 F.3d 413 (4th Cir. 2014) .................................................................39

*Hill v. W. Elec. Co.*,
   672 F.2d 381 (4th Cir. 1982) .........................................................31, 39

*Jacobs v. N.C. Admin. Office of the Courts*,
   780 F.3d 562 (4th Cir. 2015) .......................................................28, 30, 43

*Johnson v. Bd. of Trs. of Boundary Cty. Sch. Dist. No. 101*,
   666 F.3d 561 (9th Cir. 2011) ..........................................................22-23

*Jones v. Calvert Grp.*,
   551 F.3d 297 (4th Cir. 2009) .................................................................39

*Jones v. Nationwide Life Ins. Co.*,
   696 F.3d 78 (1st Cir. 2012) ..................................................................29

*Jones v. Southpeak Interactive Corp. of Del.*,
   777 F.3d 658 (4th Cir. 2015) .................................................................35

*Lewis v. Aetna Life Ins. Co.*,
   982 F. Supp. 1158 (E.D. Va. 1997) .................................................22, 23

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ..........................................................18-19

*Malhotra v. Cotter & Co.*,
   885 F.2d 1305 (7th Cir. 1989) ...............................................................39

*Mauerhan v. Wagner Corp.*,
   649 F.3d 1180 (10th Cir. 2011) .....................................................24, 25, 27

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ...................................................................................41

*McKennon v. Nashville Banner Pub. Co.,*
513 U.S. 352 (1995) ...................................................................................20

*Mercer v. PHH Corp.,*
641 F. App'x 233 (4th Cir. 2016) .............................................................32

*Miles v. Dell, Inc.,*
429 F.3d 480 (4th Cir. 2005) ....................................................................31

*Nealon v. Stone,*
958 F.2d 584 (4th Cir. 1992) ........................................................38, 39, 41

*New Directions Treatment Servs. v. City of Reading,*
490 F.3d 293 (3d Cir. 2007) .....................................................................25

*Pandazides v. Va. Bd. of Educ.,*
13 F.3d 823 (4th Cir. 1994) ......................................................................24

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ...................................................................................41

*Reyazuddin v. Montogmery County,*
789 F.3d 407 (4th Cir. 2015) ....................................................................30

*Sanchez v. Standard Brands, Inc.,*
431 F.2d 455 (5th Cir. 1970) ....................................................................31

*Serrano v. Cintas Corp.,*
699 F.3d 884 (6th Cir. 2012) ....................................................................20

*Shafer v. Preston Mem'l Hosp. Corp.,*
107 F.3d 274 (4th Cir. 1997) ..........................................3, 21, 22, 24, 25, 26

*Shirley v. Precision Castparts Corp.,*
726 F.3d 675 (5th Cir. 2013) ...................................................3, 21, 25, 27

*Smith v. First Union Nat'l Bank,*
202 F.3d 234 (4th Cir. 2000) ...................................................31, 32, 37, 38

*Sydnor v. Fairfax County,*
    681 F.3d 591 (4th Cir. 2012) ...................................................................32, 35, 37

*Teahan v. Metro-North Commuter R.R.,*
    951 F.2d 511 (2d Cir. 1991) ...................................................................23, 24, 25

*Waiters v. Robert Bosch Corp.,*
    683 F.2d 89 (4th Cir. 1982) .....................................................................................34

*Warren v. Halstead, Indus., Inc.,*
    801 F.2d 746 (4th Cir. 1986) ..................................................................................46

*Williams v. Cerberonics, Inc.,*
    871 F.2d 452 (4th Cir. 1989) ..................................................................................43

*Wilson v. Dollar Gen. Corp.,*
    717 F.3d 337 (4th Cir. 2013) ............................................................................ 3, 29

*Yashenko v. Harrah's NC Casino Co.,*
    446 F.3d 541 (4th Cir. 2006) ...............................................................................42-43

## Statutes and Regulations

28 U.S.C. § 1291 ...........................................................................................................1

29 U.S.C. § 791(g) .......................................................................................................23

42 U.S.C. § 2000e-5 ..................................................................................................1, 4

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*...................................... 1, *passim*

    42 U.S.C. § 12111 ................................................................................................30

    42 U.S.C. § 12112 ..................................................................................................2

    42 U.S.C. § 12114 ................................................................1, 3, 20, 26, 27, 28

    42 U.S.C. § 12117 ..................................................................................................1

    42 U.S.C. § 12203 ..................................................................................................4

29 C.F.R. § 1601.12 ........................................................................................34

29 C.F.R. § 1630, app. § 1630.9 .................................................................3

29 C.F.R. § 1630.2 ...........................................................................................3

## Other Authorities

135 Cong. Rec. 10,775 (1989) ............................................................ 3, 21

H.R. Conf. Rep. No. 101-596 .....................................................................21

Nat'l Insts. of Health, *Bipolar Disorder* (April 2016) https://www.nimh.nih.gov/
    health/topics/bipolar-disorder/index.shtml ...................................................5

*Proving Causation*, Employment Discrimination Law
    (Lindemann et. al eds., 5th ed. 2012) ...........................................................34

U.S. EEOC, Enforcement Guidance on Retaliation and Related Issues (Aug.
    25, 2016) ..............................................................................................34

## JURISDICTIONAL STATEMENT

Appellant Ian Lyons brought this action under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, against appellee Johns Hopkins Hospital, alleging discrimination and retaliation on the basis of his disability. The district court had jurisdiction under 42 U.S.C. §§ 12117(a) and 2000e-5(f)(3). On December 12, 2016, the district court granted Johns Hopkins' motion for summary judgment, disposing of all claims of all parties. JA 673. Lyons filed a notice of appeal on January 9, 2017. JA 674. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

This case presents three issues. The first issue involves the ADA's current-drug-user exception, 42 U.S.C. § 12114, which excludes an employee from the Act's protections where (1) the employee is "currently engaging in the illegal use of drugs," (2) the employer acts "on the basis of such use," and (3) the employee does not meet any of the safe-harbor provisions in the exception. The first issue is:

1.      Whether a disabled employee who tested positive for drug use once, more than four months before the employer fired him for not extending his medical leave, is excluded from the ADA's protections.

The two other issues are:

2.      Whether a person exhausted the administrative remedies for a retaliation claim when, among other things, his EEOC charge alleged that his employer terminated him instead of responding to his request for an accommodation.

1

3.      Whether a plaintiff who alleges that his employer retaliated against him and learns for the first time in discovery that this employer had taken additional adverse actions against him around the same time as the alleged retaliation may bring a claim in federal court based on the newly discovered facts without amending his EEOC charge.

## STATEMENT OF THE CASE

This Americans with Disabilities Act case was filed by Ian Lyons, a clinical social worker with a disability, alleging that his former employer, the Johns Hopkins Hospital, discriminated against him on the basis of his disability and retaliated against him for engaging in activity protected by the Act, including requesting reasonable accommodations. The district court granted summary judgment to Hopkins on two grounds. First, it held that, despite Lyons' disability, he was not a "qualified individual" under the Act because, in the court's view, he was a current user of illegal drugs. Second, the court dismissed two claims that the Hospital retaliated against Lyons, finding that he had not exhausted his administrative remedies.

## I.      Legal background

The ADA prohibits employers from discriminating against "qualified individual[s]" on the basis of their disability. 42 U.S.C. § 12112(a). Failing to make reasonable accommodations for an employee with a disability is a form of prohibited discrimination. *Id.* § 12112(b)(5). When an employee requests a reasonable accommodation, an employer must meaningfully interact with the employee to see if

the employee's disability can be accommodated. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013) (citing 29 C.F.R. § 1630.2(o)(3)); *see* 29 C.F.R. § 1630, app. § 1630.9. This is known as the duty to engage in the interactive process.

The Act excludes from the definition of qualified individuals "any employee or applicant who is currently engaging in the illegal use of drugs" when the employer takes action against the employee "on the basis of such use." 42 U.S.C. § 12114. This current-drug-user exception allows employers to take action against employees because of their drug use even though drug addiction is a disability protected under the Act. *See Shafer v. Preston Mem'l Hosp. Corp.*, 107 F.3d 274, 278-79 (4th Cir. 1997). But if an employee using illegal drugs "has a different disability" than drug addiction, "and is subjected to discrimination because of that particular disability, that individual remains fully protected under the ADA." *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 679 n.13 (5th Cir. 2013) (quoting 135 Cong. Rec. 10,775 (Sept. 7, 1989) (Sen. Kennedy)). Further, the current-drug-user exception has a safe harbor protecting individuals who either (1) have completed a drug rehabilitation program or have otherwise been rehabilitated successfully and are no longer using drugs; (2) are currently participating in a rehabilitation program and are no longer using drugs; or (3) who are erroneously regarded as using drugs, but in fact are not. 42 U.S.C. § 12114(b).

The Act separately prohibits any person or employer from retaliating against any other person—including people who are not otherwise protected under the Act— for seeking the protections of the Act, such as requesting a reasonable

3

accommodation or filing a charge with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 12203(a), (b). Federal law generally requires a claimant to exhaust the administrative process by filing an EEOC charge describing the allegedly prohibited conduct before bringing a case in federal court. 42 U.S.C. § 2000e-5(b).

## II.    Factual background

Lyons is a clinical social worker with a master's degree and more than a decade of experience in social-service settings. JA 7. Lyons has bipolar disorder, a disability covered by the ADA. JA 666. Soon after accepting employment at Hopkins, Lyons realized that the rotating shifts, late-night hours, and irregular days off were inhibiting his ability to manage his condition and that he needed a more regular schedule to accommodate his disability. JA 137-38. Despite requesting this accommodation several times, Hopkins refused to accommodate Lyons' disability or even meaningfully engage in an interactive process regarding his requests. JA 134-35. Over the next several months, Lyons' health deteriorated, and, after several absences from work, he tested positive for drug use. JA 493. While on an approved medical leave of absence during which Lyons' condition was successfully treated by his psychiatrist, Lyons again requested accommodations. JA 207, 270. Hopkins again ignored this request, and instead fired him and submitted a complaint about him to a licensing board. JA 274, 329, 652.

4

## A. Lyons' disability

Lyons was diagnosed with depression and anxiety associated with bipolar disorder in 1991. JA 7. Bipolar disorder causes "unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks." Nat'l Insts. of Health, *Bipolar Disorder* (April 2016), https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (*Bipolar Disorder*). Lyons has managed his bipolar disorder with medication and regular treatment by a psychiatrist, and integrated his disability into his professional career. JA 7. In fact, Lyons co-founded a "Peer Operated Clinic," where all clinicians are themselves consumers of mental-health services. *Id.*

The primary symptoms of bipolar disorder include "periods of unusually intense emotion, changes in sleep patterns and activity levels, and unusual behaviors." *Bipolar Disorder, supra.* Self-medication is a common secondary symptom that arises during periods of "decompensation," where the person loses control over his anxiety or depression. JA 51, 624, 640-44. More than 60 percent of people with bipolar disorder have a history of substance abuse during periods of decompensation. JA 51, 624, 630-38. Lyons testified that he used controlled substances during two periods of decompensation in 1997 and 2001, but successfully managed his disability, through medication and regular access to his doctor, to avoid any other periods of decompensation and substance abuse in the decade leading up to his employment at Johns Hopkins. JA 154-55.

5

## B. Lyons' employment with Johns Hopkins

Around October 2011, Lyons applied for the position of Pediatric Emergency Department Social Worker at Johns Hopkins. JA 46-47. During a pre-hiring interview, Lyons discussed the work-schedule expectations with his potential supervisor, Paula Heneberry. JA 64-65. Heneberry explained to Lyons that clinical social workers in the Emergency Room (ER) used a rotating schedule and that adding Lyons would allow the hospital to make the schedule more consistent and give employees consecutive days off. JA 64-65. Johns Hopkins offered Lyons the job, starting part-time. JA 237. Heneberry chose Lyons because, in addition to his glowing references, she hoped that his "pretty big personality" would "enhance the ER team's highly stressed social workers." JA 490.

Between receiving the job offer and accepting the job, Lyons told Heneberry about his disability and the medications he used to treat it. JA 62. On July 3, 2012, Heneberry emailed Lyons that "unless you act like a nut after you start, we can plan on increasing you to full time." JA 8, 26. Two days later, Lyons emailed Heneberry to explain that the medication used to treat his disability would show up in the urinalysis used in the pre-employment health screening. JA 9, 62, 245. Heneberry replied by telling him: "Just don't act too crazy and you should be fine." JA 9, 615. On forms provided at his pre-employment health screening, Lyons noted his psychiatric disorder and depression, as well as the medications he took for his condition. JA 239-43. Later in July 2012, Lyons received full clinical licensure in Maryland and started

6

part-time at Johns Hopkins. JA 7. By September 2012, Lyons was promoted to full-time. JA 81. Reference letters demonstrate that he was an excellent employee. JA 647, 649, 651.

### C. Lyons' first requests for an accommodation in November and December 2012

Even after becoming full-time, Lyons' schedule remained inconsistent and unpredictable, causing his mental health to deteriorate between October and December 2012. Lyons took several absences to cope with bouts of depression and anxiety, which attracted the attention of his supervisors. JA 9-10. Twice during this time, Lyons' supervisors noticed that he became upset while at work. This happened once when he learned that an administrative error left him without health insurance and at risk of running out of his medication, and another time when he declined to sign a pledge to work if hospital workers went on strike because he felt that breaking a strike would be contrary to the Social Work Code of Ethics. JA 87, 91, 95, 245.

In November and December 2012, Lyons asked for a schedule change as an accommodation for his disability in "multiple conversations" with Heneberry. JA 134-38, 625. Twice, he asked her for what he called a "reasonable accommodation" under the ADA and whether there was a policy or format under which to make the request. JA 134-35, 137. Heneberry discouraged Lyons from making a request, warning that he would just be "making trouble." JA 135. She told him that she was going to make appropriate changes to the schedule, but that "in the meantime," he was "not going to

receive any special treatment." JA 135.

On December 12, 2012, Lyons received a written reprimand because he had been absent for a fifth time over a six-month period and because Hopkins had received a letter on December 7, 2012 about Lyons' "unprofessional behavior." JA 9-10, 249. The letter stated that Lyons raised his voice and acted unprofessionally with a school social worker who had brought a student into the ER to request a medication change. JA 246. Lyons testified that he was following the instruction of the doctors who supervised the ER to take a "firm hand" with social workers from this school because they had been abusing Johns Hopkins' services by bringing students into the ER for non-emergency requests. JA 106-07. Lyons responded by asking Heneberry again how to seek a reasonable accommodation under the ADA and whether he should file a written request, noting that the unpredictable shifts were disrupting his sleep cycle and exacerbating his symptoms. JA 132-33, 137-38.

Because of these incidents, Heneberry directed Lyons to undergo a fitness-for-duty evaluation. JA 249. During that evaluation, Lyons tested positive for cocaine use. JA 493. Lyons immediately took responsibility for this result, explaining that the past several months of high stress at work caused a period of decompensation during which he had used cocaine in response to his anxiety and depression. JA 6-11, 153-55. Lyons formally requested a medical leave of absence to seek intensive treatment for his condition from December 19, 2012 until February 25, 2013, which Heneberry approved. JA 11, 254.

8

### D. Lyons' treatment

During his medical leave, the Hospital directed Lyons to meet with Charles Glicksman in the Faculty and Student Assistance Program. JA 152-53. During that meeting, Glicksman and Lyons explored various treatment options, and Glicksman provided "recommendations and referrals," JA 11, 479, but did not say they were mandatory, JA 181. On Glicksman's recommendation, Lyons attended a screening, assessment, evaluation, and three therapy sessions at a program called The Resource Group. JA 157-58.

At The Resource Group, a newly-licensed social worker assigned as Lyons' therapist said that she felt "ill-equipped" to treat Lyons and expressed doubts about The Resource Group's ability to successfully address Lyons' psychiatric needs. JA 180. These doubts arose because the Group did not have a physician certified to prescribe the medications Lyons needed to treat his disability. *Id.* As a result, Lyons focused on treatment by his personal psychiatrist, Dr. Chul Kwon, who was qualified to prescribe the medication Lyons needed and thereby provided a higher level of treatment than was available at The Resource Group. Starting in January, Lyons sought regular in-person treatment by Dr. Kwon and worked with him to make the appropriate medication adjustments. JA 160, 163.

### E. Lyons makes additional requests for accommodations, and Johns Hopkins fires him.

On February 14, 2013, Lyons submitted a short-term disability update

expressing his intent to return to work at Johns Hopkins. The update included documentation from Dr. Kwon indicating Lyons' current diagnosis, describing his treatment plan, and clearing Lyons to return to work on April 15, 2013. JA 654.

**1. Johns Hopkins extends Lyons' medical leave.**

On February 25, 2013, Janet Koelsch—a short-term disability administrator at Hopkins—sent Lyons a letter acknowledging receipt of the short-term disability update and extending Lyons' medical leave through March 20, 2013. JA 12-13, 275, 473.

**2. Hopkins discusses firing Lyons.**

That same day, Hopkins employees exchanged several emails. Heneberry first sent an email to Glicksman, Koelsch, and Angela Davis—a benefits specialist at the hospital—stating that "I understood I could terminate [Lyons] if he did not return by expiration of" his leave on February 25 and asking why "his disability had been extended without [her] knowledge of status or input about decisions." JA 473. Glicksman responded that Lyons was "non-compliant with his referrals," such as The Resource Group, but "rescinded" his "non-compliance statement" about ten minutes later, after Koelsch shared that she had received an update from Dr. Kwon and after Glicksman himself spoke to Lyons on the phone. JA 472, 655-56.

On March 1, 2013, Heneberry sent another email to Davis asking whether there was "[a]ny word on my permission to terminate Ian Lyons? Health leave expired on 2/25 and he has not returned." JA 658. Davis responded that she had talked with

10

Lyons that day about his clearance and intent to return to work on April 15, and that "[i]t may be a few more days before I have an answer on termination from the ADA group." *Id.*

On March 4, Heneberry followed up with Davis, asking "can you teach me why he gets an extension when he did not have a return date prior to or on the expiration of his health leave?" *Id.* Several days later, Glicksman confirmed in an email to another hospital employee that Heneberry "ha[s] been requesting that [Lyons] be terminated because he is supposedly out of benefit time." JA 474.

On March 13, Davis responded to Heneberry by confirming that Lyons "is covered under the ADA" and that "he can't be term[inated] until we reach out to him to determine his intent to return." JA 657. She added that "[e]xtending his leave may be a reasonable accommodation if he will be cleared in the next month," and that she would send Lyons a letter requesting additional information. *Id.* "If he doesn't respond," Davis concluded, "we can move forward with his termination, but if he sends back a response, we'll have to see if he can be accommodated before he can be term[inated]." *Id.*

That same day—March 13—Davis sent a letter to Lyons containing a series of confusing and contradictory dates. JA 653. The letter stated that Lyons' leave expired on February 25, but that he had until March 31 to submit a form indicating whether he wanted to return to work and whether he was requesting reasonable accommodations under the ADA, "such as extension of leave." *Id.* The letter also

11

stated that Lyons' "employment will be terminated effective 3/13/13"—the same day the letter was sent. *Id.*

### 3. Lyons again requests reasonable accommodations under the ADA.

On March 26, Lyons sent an email to Heneberry, Davis, and Koelsch expressing his intent to return to work and requesting reasonable accommodations to manage his disability; specifically, he sought regularly scheduled daytime working hours and two consecutive days off per week. JA 270-71. Koelsch responded to the group email that Lyons must be cleared by Hopkins' Occupation Health office before he could return to work and told Lyons to contact them. JA 269-70. Lyons asked for some assurance that Hopkins would consider his request for accommodations, and Davis responded that Lyons needed to fill out the form sent with the March 13 letter to have Hopkins consider his request. JA 268-69. Davis told Lyons that he had until March 31, 2013 to submit the form requesting accommodations. JA 268.

On March 29, 2013, Lyons submitted to Johns Hopkins the required form for requesting daytime hours and two consecutive days off per week as reasonable accommodations under the ADA. JA 207. Johns Hopkins confirmed receipt of his formal request for accommodations. *Id.*

### 4. Johns Hopkins fires Lyons.

On April 16, 2013, Lyons contacted Glicksman to ask whether he could return to work. JA 516. Glicksman told him that he could not clear him to return at that time because he had not followed the "treatment recommendations." *Id.* Lyons explained

12

that he had worked with another provider and would follow up on Glicksman's most recent instructions. *Id.* Glicksman communicated this update to Heneberry, Davis, and other hospital employees. *Id.* Heneberry responded that same day, writing: "We are not starting from scratch with him are we??? Why aren't we terminating him for lack of compliance within the stated time frame of approved health leave and benefits??" *Id.* Glicksman responded that his program "has nothing to do with whether a client is hired or fired." *Id.*

On April 18, Johns Hopkins sent Lyons a letter terminating him because his "leave of absence expired on 02/25/13," and he "ha[d] not yet returned to work or requested an extension as a reasonable accommodation under the ADA, or his request for reasonable accommodation had been denied." JA 652. At no time before this litigation did Hopkins suggest, in internal emails or in communications to Lyons, that his December 2012 positive drug test was the reason for his termination.

## F.  Heneberry submits a complaint about Lyons to the licensing board.

On March 19, 2013, six days after Hopkins confirmed with Heneberry that Lyons was covered by the ADA, Heneberry filed a complaint about Lyons with the Maryland Board of Social Work Examiners (Maryland Board). JA 16, 36, 274, 329. The complaint alleged that Lyons had an active and untreated substance abuse problem that Heneberry felt rendered Lyons unfit to treat patients. JA 329-30. Lyons did not learn that his supervisor, Heneberry, was the person who filed this complaint about him until obtaining discovery in this lawsuit. JA 624.

13

On November 8, 2013, the Maryland Board brought formal charges against Lyons to investigate Heneberry's complaint. In March 2014, the Board and Lyons entered a consent order that placed Lyons on probation and required him to comply with certain conditions, including random drug tests. JA 293-94. Lyons was unable to comply with the terms of the order, in part because he was unable to attend three drug tests, although he had taken three others. JA 234, 294. On January 20, 2015, he voluntarily surrendered his license to practice social work in Maryland. JA 235-36, 297.

## III.   Procedural background

On May 15, 2013, Lyons filed an EEOC charge form and intake questionnaire without help from an attorney. JA 618-21, 660. On both the charge form and questionnaire, Lyons checked the box for discrimination on the basis of disability but did not check the box for retaliation. JA 619, 660. The charge alleged that Lyons had requested accommodations on March 29, 2013 and that, "despite continual contact" and "questioning about the status of my request for an accommodation, no reply was ever received. Instead . . . I was told my employment was terminated with no reference to my aforementioned and documented request for a reasonable accommodation." JA 660. The charge finishes: "I believe I was denied a reasonable accommodation and discharged due to disability in violation" of the ADA. *Id.* The EEOC conducted a brief investigation into his claims and issued Lyons a right-to-sue

14

letter on October 27, 2014. JA 612-13.[1]

On January 27, 2015, Lyons filed a *pro se* complaint in district court, alleging violations of the ADA. The court appointed Lyons counsel, and Lyons amended his complaint on January 22, 2016. The First Amended Complaint alleges three ADA claims. JA 17-20. Count I alleges discrimination under the ADA based on the Hospital's failure to provide reasonable accommodations and failure to engage in the interactive process. JA 17. Counts II and III both allege retaliation. JA 19-20. Count II alleges that Hopkins retaliated against Lyons by terminating him because he engaged in activity protected by the Act, including requesting reasonable accommodations and taking leave to treat his disability. JA 19. Count III alleges that Hopkins retaliated against Lyons by submitting a complaint about him to the Maryland Board of Social Work Examiners because Lyons had engaged in activity protected by the Act. JA 20.

Hopkins moved for summary judgment, arguing for the first time that Lyons was terminated not because he failed to extend his medical leave (which is what Hopkins had contended prior to the lawsuit), but on the basis of his drug use. Hopkins asserted that Lyons was therefore excluded from the ADA's protection under the ADA's current-drug-user exception. ECF 46-1, at 25-29. Johns Hopkins also argued that the court lacked jurisdiction over the retaliation claims because Lyons had not properly exhausted them. ECF 46-1, at 33.

---

[1] After filing with the EEOC, Lyons also filed an internal discrimination complaint with Johns Hopkins, but the internal office halted its investigation when it learned that Lyons had also filed a charge with the EEOC. JA 16, 32, 404-05.

The district court agreed with Hopkins. JA 673. First, the court held that Lyons was not a "qualified individual" under the ADA because he fell under the current-drug-user exception. JA 666-69. The district court found that, although the record showed that Lyons had not used drugs for at least four months before his firing, "[f]our months is not such a lengthy period that Lyons cannot qualify as a current user," JA 668, and that he did not fall within the safe-harbor provision, which protects individuals who have been rehabilitated and are no longer using drugs, JA 669. The district court also held that Lyons had not exhausted his two retaliation claims because "the narrative of the charge does not allege or describe retaliation." JA 671. Finally, the district court held, in a footnote and without discussion, that "[e]ven if the plaintiff had exhausted his administrative remedies with respect to his retaliation claims, the Hospital has articulated a legitimate business reason—Mr. Lyons' current drug use and his failure to attend treatment—for its decisions, which Mr. Lyons has not shown to be pretext." JA 672.

## SUMMARY OF ARGUMENT

**I.** In addressing Lyons' discrimination claim, the district court first erred in finding that Lyons was not a "qualified individual" under the current-drug-user exception because the bulk of the conduct supporting this claim occurred *prior to* his only positive drug test. Lyons can establish his discrimination claim based only on Hopkins' failure to engage with his requests or accommodate his disability before the drug test, so the district court's decision to apply the current-drug-user exception to

16

facts that happened before the drug test should be reversed.

Nor does the ADA's current-drug-user exception excuse Hopkins' discrimination that occurred after the drug test. First, the hospital did not "act on the basis" of Lyons' drug use when it failed to engage with Lyons' requests or accommodate his disability. Johns Hopkins raised the issue of Lyons' positive drug test for the first time in litigation—even Lyons' termination letter did not reference drug use—belying Hopkins' assertion that it failed to accommodate him for that reason.

Second, Lyons tested positive for a prohibited substance only once—four months before Johns Hopkins terminated him—and his drug use was a secondary symptom of his underlying disability, not a drug addiction. Whether these facts establish that Hopkins reasonably believed Lyons was currently engaging in illegal drug use is a jury question. Finally, Lyons' treatment by his doctor and four months of sobriety prior to his termination show that he meets the statute's safe-harbor provision, which protects employees who are no longer using drugs.

**II.** As for the retaliation claims, Lyons properly exhausted his administrative remedies with respect to both claims, and he has established disputes of fact about Hopkins' purported reasons for firing him that entitle him to a trial. The touchstone for exhaustion is whether a claimant's administrative and judicial claims are reasonably related. Because EEOC charge forms are typically filled out by laypersons without the help of lawyers, courts interpret the narrative contained in the EEOC charge broadly

17

to protect the employees' rights. Under this standard, Lyons' EEOC documents sufficiently describe his first retaliation claim by alleging that Hopkins terminated Lyons in response to his request for a reasonable accommodation. At the very least, this retaliation claim involves conduct sufficiently related to the discriminatory conduct alleged in the charge form to satisfy this Court's exhaustion requirement.

Lyons may likewise bring his second retaliation claim, stemming from Heneberry's complaint to the Maryland Board of Social Work Examiners, because it references additional retaliatory conduct by the same actor, during the same time frame, and under the same circumstances alleged in the charge. Lyons was not aware that it was Heneberry who had complained to the Maryland Board of Social Work Examiners (and when she did) until discovery in this litigation and, therefore, was not required under this Court's precedent to amend his charge form before bringing suit.

Finally, Lyons has demonstrated genuine issues of material fact surrounding Hopkins' reason for firing him and filing the complaint with the Maryland Board. Evidence shows that Hopkins' shifting reasons for these actions against Lyons were pretext, entitling him to a trial on the retaliation claims.

## ARGUMENT

### Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). In doing so, this Court is "required to view the facts and all justifiable inferences arising therefrom in

the light most favorable to the nonmoving party," *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013), and "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015). This Court reverses a grant of summary judgment if, when viewed in this light, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

I.  **Lyons is a "qualified individual" under the ADA who has established disputes of fact regarding whether Johns Hopkins discriminated against him on the basis of his disability.**

The district court granted summary judgment on Lyons' discrimination claim because it found that Lyons was not a "qualified individual" under the ADA, determining that he was a current drug user. This ruling was wrong for several reasons.

A.  **Lyons was a qualified individual under the ADA each time he requested accommodations.**

The district court failed to recognize that the bulk of the conduct supporting Lyons' discrimination claim occurred *before* his December 13 drug test and so that, in law and logic, the drug test could not justify earlier discriminatory acts. In the words of the statute, Hopkins could not possibly have acted "on the basis" of drug use when it failed to engage in the interactive process or accommodate Lyons. Finding that Lyons "was unqualified at the relevant time frame as a result of his drug abuse rests on the erroneous assumption" that Hopkins "could have used evidence of [Lyons']

19

drug abuse as an after-the-fact justification" for its "allegedly discriminatory conduct." *Bowers v. NCAA*, 475 F.3d 524, 537 (3d Cir. 2007); *cf. Serrano v. Cintas Corp.*, 699 F.3d 884, 903-04 (6th Cir. 2012) (explaining that after-acquired evidence of wrongdoing is relevant only to damages, not initial liability). Hopkins cannot point to "after-acquired evidence of wrongdoing"—here, Lyons' positive drug test in mid-December 2012— to justify its discriminatory acts in November and early December, when Lyons made multiple requests for accommodations. Such evidence may not "bar all relief for an earlier violation of the Act." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358 (1995) (making same point in Age Discrimination in Employment Act context). This Court should reverse on this basis alone.

And after the drug test as well, Lyons was a "qualified individual" because (1) Johns Hopkins did not, by its own admissions, refuse to accommodate him "on the basis of [drug] use," (2) Lyons was not a current drug user, and (3) Lyons fell within the Act's safe harbor. 42 U.S.C. § 12114(a), (b). As a qualified individual under the ADA, Lyons easily met his burden of setting forth material facts demonstrating that Johns Hopkins failed both to engage in any interactive process with him to determine a reasonable accommodation and to accommodate him under the ADA.

## 1. Johns Hopkins did not act "on the basis of" Lyons' drug use.

To rely on the current-drug-user exception, the employer must act "on the basis of" the employee's drug use. 42 U.S.C. § 12114(a). This requirement reflects the exception's purpose: to "ensure that employers would be able to 'discharge or deny

employment to persons who illegally use drugs on that basis, without fear of being held liable for discrimination.'" *Shafer v. Preston Mem'l Hosp. Corp.*, 107 F.3d 274, 279 (4th Cir. 1997) (quoting H.R. Conf. Rep. No. 101-596, at 64). Limiting the exception to that circumstance is intended to protect individuals, like Lyons, who have disabilities other than drug addiction. An individual who uses illegal drugs but "also has a different disability, and is subjected to discrimination because of that particular disability," remains "fully protected under the ADA." *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 679 n.13 (5th Cir. 2013) (quoting 135 Cong. Rec. 10,775 (Sept. 7, 1989) (Sen. Kennedy)). This case presents precisely that situation. Because Lyons has a different disability, and was subjected to discrimination because of that disability rather than his drug use, he remains fully protected by the ADA regardless of his drug use.

First, Hopkins could not possibly have acted "on the basis of" Lyons' drug use from November 2012 until December 13, 2012, the only time Lyons tested positive for drug use. JA 252-53, 493. Lyons requested an accommodation "multiple times" over these months, but Hopkins discouraged him from "making trouble" by pursuing his ADA rights and refused to change his schedule. JA 134-35, 625. And Lyons' discrimination claim rests not on his termination, but on Hopkins' failure, during his employment, to engage in the interactive process and to accommodate his disability.

In any case, Lyons was not fired "on the basis of" his drug use. Johns Hopkins stated that it fired Lyons for not extending his leave. JA 653. Hopkins' claim that it

fired Lyons for his drug use came only later, in an effort to fall within the current-drug-user exception, after litigation started and long after Lyons was fired. Neither before or after the drug test did Lyons' drug use serve as a basis for Hopkins' acts, including its failure to engage with and accommodate Lyons. The district court's conclusion that "only persons who have refrained from using drugs for some time are protected under the statute" ignored a crucial element of the exception and is therefore reversible error. *See* JA 668 (quoting *Shafer*, 107 F.3d at 280).

## 2. Lyons was not "currently engaging in the use of drugs" when Hopkins failed to accommodate him.

The district court found that Lyons was a current user because, although "he was abstinent for about four months at the time of his discharge," that time was "not such a lengthy period" that he "cannot qualify as a current user." JA 668. In doing so, the district court again conflated Lyons' retaliation and discrimination claims. Lyons claimed that Hopkins failed to accommodate him both in November and early December, by failing to engage in an interactive process with him when he requested accommodations, and also during his medical leave in March, when Hopkins ignored another of his requests for accommodation. And Lyons' status as a current user when Hopkins did fire him is a disputed material fact for the jury.

**a.** As for Hopkins' pre-drug-test failure to accommodate, Lyons surely was "'a qualified individual with a disability' at the time of the alleged discrimination." *Lewis v. Aetna Life Ins. Co.*, 982 F. Supp. 1158, 1162 (E.D. Va. 1997); *see also Johnson v. Bd. of Trs.*

22

*of Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 564 (9th Cir. 2011) (ADA plaintiff must "show that []he was 'qualified' at the time of the alleged discrimination.");

*Adkins v. Coventry Health Care, Inc.*, 172 Fed. App'x 19, 21 (4th Cir. 2006) (prima facie case of sex discrimination requires job performance meeting employer's expectations "at the time of the adverse employment action"). For that reason, Lyons' "right to maintain a claim for discrimination pursuant to ADA Title I therefore vested at that time [of the alleged discrimination], and continues" regardless of whether Lyons later became unable "to perform his duties" because he was a current drug user or otherwise. *Lewis*, 982 F. Supp. at 1162.

**b.** Even as to the discriminatory conduct after Lyons' drug test, the district court improperly determined, as a matter of law, that Lyons was a current user when Hopkins fired him. A plaintiff's "status as a current substance abuser" is "a question of fact" turning on whether the employer "held a reasonable belief that [the plaintiff] had a current substance abuse problem" that should be determined by a jury. *Teahan v. Metro-North Commuter R.R.*, 951 F.2d 511, 520 (2d Cir. 1991) (interpreting the Rehabilitation Act).[2] By analogy, in the negligence context, "reasonableness under the circumstances of a particular case is a classic question of fact within the province of the jury." *Conkel v. Van Pelt*, 1988 WL 83318, at *2 (4th Cir. Aug. 2, 1988); *see also*

---

[2] *See* 29 U.S.C. § 791(g) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . .").

*Carrozza v. Howard County*, 1995 WL 8033, at *3 (4th Cir. Jan. 10, 1995) (explaining that "[t]he reasonableness of a proposed accommodation is a question of fact which ordinarily should be decided by a jury") (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994)).

The district court made its own determination that "the Hospital could reasonably believe that the plaintiff's cocaine use remained an ongoing problem." JA 669. But the correct standard is whether no jury could find that it would have been unreasonable for the Hospital to believe that Lyons was a current user. This inquiry is highly fact-specific, so courts look to the facts on a case-by-case basis to determine whether the substance abuse problem is "severe and recent enough so that the employer is justified in believing that the employee is unable to perform the essential duties of his job." *Teahan*, 951 F.2d at 520; *see also Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1186-88 (10th Cir. 2011) (gathering cases); *Shafer*, 107 F.3d at 280. Factors include "severity of the employee's addiction and the relapse rates for whatever drugs were used" as well as "the level of responsibility entrusted to the employee; the employer's applicable job and performance requirements; the level of competence ordinarily required to adequately perform the task in question, and the employee's past performance record." *Mauerhan*, 649 F.3d at 1188. For example, in *Mauerhan*, the Tenth Circuit explained that an employer could reasonably believe drug use was current when an addiction specialist estimated that three months of treatment would be necessary, but the employee underwent treatment for one month. *Id.* at 1183, 1189.

24

Here, a jury should have considered Lyons' exceptional work performance, JA 647-51, his over four months of sobriety, JA 624, and that Hopkins' evaluating clinician estimated that "at least a month" of treatment would be necessary for Lyons' particular case, which was "an estimate that depend[ed] on many factors," JA 497.

**c.** Lyons had been drug-free for four months before his firing. JA 668. No circuit court of which we are aware has ever held that such a long period of abstinence was current use as a matter of law. *See, e.g.*, *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 680 (5th Cir. 2013) (eleven days is "current"); *Shafer*, 107 F.3d at 278 (less than a month); *Baustian v. Louisiana*, 1997 WL 73790 at *1 (5th Cir. Feb. 10, 1997) (seven weeks). And, more importantly, at least three have found that plaintiffs who were abstinent for less time may not be current users. *See Teahan*, 951 F.2d at 513, 520 (remanding for fact-finding to determine whether a plaintiff, who spent one month in rehabilitation and was drug-free for less than a month, had a current substance abuse problem); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 310 (3d Cir. 2007) (remanding to determine whether plaintiffs who were drug-free for three months were current drug users under the ADA); *Mauerhan*, 649 F.3d at 1188 (suggesting that a plaintiff could be found not a current drug user after 30 drug-free days).

*Shafer* is, to our knowledge, the only case where this Court has construed the term "currently using drugs." There, the Court considered a plaintiff who undisputedly "engaged in the illegal use of drugs less than a month prior to her

firing." *Shafer*, 107 F.3d at 277 n.4. This Court held that Shafer's admissions that "she illegally used drugs during the weeks and months prior to her discharge and that she stole narcotics from the Hospital to support her addiction less than a month before she was fired" were sufficient to qualify her as a current drug user under the Act. *Id.* at 278. The circumstances here are markedly different from *Shafer*. Lyons tested positive for drug use only once, four months before being fired. Unlike in *Shafer*, Lyons' disability is not drug addiction; rather, episodic drug use is a secondary symptom of his disability during periods of decompensation and he stabilized his disability with his doctor, who cleared him to return to work. Moreover, Lyons testified that he did not use illegal drugs between December 13, 2012, when he tested positive for drug use, and when he was terminated. Finding that Lyons was "currently" using drugs would extend this exception to the ADA's protections far beyond this Court's precedent.

### 3. Lyons fell within the exception's safe-harbor provisions.

The district court failed to determine independently whether Lyons qualified for the safe harbor under 42 U.S.C. § 12114(b). The current-drug-user exception contains several safe-harbor provisions. They protect an employee who "has otherwise been rehabilitated successfully and is no longer engaging in [drug] use," *id.* § 12114(b)(1), or who is "erroneously regarded as engaging in such use, but is not engaging in such use," *id.* § 12114(b)(3). After finding Lyons was a current drug user, the district court reasoned merely that Lyons did not qualify for the safe harbor because, "for reasons stated above, it was reasonable for the Hospital to believe Lyons

26

was 'currently engaging in the illegal use of drugs' when the Hospital discharged him." JA 669.

**a.** The district court explained that eligibility for the safe harbor "must be determined on a case-by-case basis, examining whether the circumstances of the plaintiff's drug use and recovery justify a reasonable belief that drug use is no longer a problem." JA 671 (citing *Mauerhan*, 649 F.3d at 1188; *Shirley*, 726 F.3d at 681). But that approach parrots the accepted standard for whether a person is "currently" using drugs. The application of the safe harbor must require some additional analysis than simply applying the "currently" standard again. 42 U.S.C. § 12114(a). If the safe harbor just encompasses every individual who does not meet the definition of current user as defined in section 12114(a), the safe harbor would do no work at all. The safe harbor must therefore protect employees who meet its statutory conditions, even if they might otherwise be considered current users under section 12114(a).

**b.** The record shows that Lyons meets the safe-harbor conditions. The first safe harbor protects individuals who have "been rehabilitated successfully" and are "no longer engaging in [drug] use." 42 U.S.C. § 12114(b)(1). As noted, Lyons did not use any illegal drugs between December 13, 2012, when he tested positive for cocaine, and May 2, 2013, when he learned that he had been fired. JA 624. During his medical leave of absence, Lyons sought proper treatment by seeing his regular treating psychiatrist. JA 163, 185, 267, 270. This was a higher level of treatment than available at The Resource Group, which was unable to prescribe the medication used to

27

manage his disability and where his counselor told him she was not yet experienced enough to treat his condition. JA 180. Lyons successfully underwent treatment by his physician, who cleared Lyons to return to work. JA 654. Thus, Lyons had rehabilitated successfully and was not actually using drugs when Johns Hopkins engaged in the alleged discriminatory acts.

Another safe harbor provision protects individuals who are "erroneously regarded as engaging in such use," but are "not engaging in such use." 42 U.S.C. § 12114(b)(3). To the extent that Hopkins acted against Lyons for his drug use, a reasonable juror could have determined that he was "not engaging in such use," given that he only tested positive for drug use one time, had been treated for the underlying cause of this secondary symptom, and had been abstinent for four months.

### B. There are disputes of fact about whether Johns Hopkins discriminated against Lyons.

Once viewed, as he should be, as a "qualified individual" under the ADA, Lyons has presented facts indicating that Johns Hopkins (1) failed to engage in an interactive process that would have resulted in finding a reasonable accommodation and (2) failed to accommodate his disability. A finding in favor of Lyons on either point would serve as a basis for recovery under the ADA's prohibition on discrimination. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581-82 (4th Cir. 2015).

**1.** Johns Hopkins had a "duty to engage in an interactive process to identify a

reasonable accommodation" when Lyons communicated his request for an accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013). Once this duty is triggered, "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Id.* at 347 (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91 (1st Cir. 2012)).

The record shows that Johns Hopkins failed to engage in the interactive process with Lyons and that the parties could have found a reasonable accommodation had this process occurred. On several occasions in November and December 2012, Lyons asked to be accommodated with a more regular schedule to manage his disability, specifically referencing reasonable accommodations under the ADA. JA 134-35, 137-38, 625. On one of these occasions, Heneberry discouraged him from doing so, stating that he would just be "making trouble" if he did and refusing to give him "any special treatment." JA 135. On December 12, Lyons again invoked the ADA and asked Heneberry for an accommodation. JA 137-38. Finally, using forms provided by Johns Hopkins, on March 29, 2013, Lyons formally requested daytime working hours and consecutive days off as reasonable accommodations for his disability. JA 13, 207, 270-71.

Hopkins failed to engage in a good-faith interactive process at any point during Lyons' employment and discouraged him from pursuing his rights, despite several

29

requests. *See Jacobs*, 780 F.3d at 581. Lyons identified potential accommodations that could have been reached, regular daytime working hours and two consecutive days off per week. *See* 42 U.S.C. § 12111(9) (A "reasonable accommodation" may include a "modified work schedule."). And Hopkins never claimed that modifying his schedule would create an undue hardship. *See Reyazuddin v. Montgomery County*, 789 F.3d 407, 414 (4th Cir. 2015).

    **2.** Lyons set forth material facts demonstrating that John Hopkins failed to accommodate his disability. On this score, Lyons must ultimately show that he is an individual with a disability, that Johns Hopkins had notice of his disability, that he could perform the essential functions of his job with a reasonable accommodation, and that Johns Hopkins refused to make any reasonable accommodation. *Reyazuddin*, 789 F.3d at 414.

    Hopkins does not dispute that bipolar disorder is a disability covered by the ADA. JA 666. Lyons communicated about his disability to his supervisor several times both prior to employment, during health screenings shortly before starting the job, and when his disability began to impact his work. JA 18, 62, 134-35. And on multiple occasions, Lyons requested a more regular schedule to manage his disability and allow him to meet Hopkins' performance expectations. JA 64-65, 134-35. But Lyons' schedule remained the same, and the disruption to his sleep cycle exacerbated his disability. The record shows that Hopkins refused to make any accommodation each time Lyons asked. JA 134-35, 652. Instead, Hopkins fired Lyons.

30

## II.    Lyons has exhausted his two retaliation claims, and there are disputes of fact on those claims.

Lyons' first retaliation claim (that he was terminated in retaliation for protected activity) and his second retaliation claim (that Heneberry filed a complaint with the Maryland Board of Social Work Examiners in retaliation for protected activity) were both properly exhausted. A plaintiff may bring claims in federal court that are alleged in the EEOC charge, are reasonably related to the charge, or grow out of the allegations contained in the charge. Both claims meet this test.

### A. Lyons exhausted his first retaliation claim that Hopkins terminated him in retaliation for protected activity.

**1.** A plaintiff may bring any claims in a subsequent lawsuit that "are reasonably related to her EEOC charge." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000)). An employment discrimination lawsuit may extend to "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations" that are contained in the charge. *Hill v. W. Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).[3]

Because "lawyers do not typically complete the administrative charges," this Court construes the scope of what is contained in or reasonably related to an EEOC charge "liberally" and in the employee's favor. *Chacko v. Patuxent Inst.*, 429 F.3d 505,

---

[3] Many of the exhaustion cases cited in this section are Title VII cases, but the standards for exhaustion are the same under the ADA. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001).

31

509 (4th Cir. 2005). The Supreme Court has instructed that "[d]ocuments filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 406 (2008). But claims may be barred where the EEOC charge "reference[s] different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko*, 429 F.3d at 506. In sum, "[t]he touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' not 'precisely the same.'" *Sydnor v. Fairfax County*, 681 F.3d 591, 595 (4th Cir. 2012) (citing *Smith*, 202 F.3d at 247).

This Court has cautioned that the exhaustion requirement "should not become a tripwire for hapless plaintiffs." *Id.* at 594. Requiring "absolute precision in the administrative charge" or "a detailed essay to the EEOC" is inconsistent with the limited purpose of the administrative process: to put employers on notice of the alleged violation and encourage out-of-court settlement. *Id.* at 594, 597. Technical errors like not checking the box for "retaliation" will not alone bar a plaintiff from maintaining a claim for retaliation in district court. *See Mercer v. PHH Corp.*, 641 F. App'x 233, 238-39 (4th Cir. 2016); *see also* JA 671 (decision below noting that not checking the box does not bar Lyons' claim).

**2.** Here, the charge itself sufficiently alleges that Johns Hopkins retaliated against Lyons by terminating his employment in response to his request for an

32

accommodation under the ADA. The charge form explains that Lyons submitted the appropriate forms to request a reasonable accommodation, and "despite continual contact" with his supervisors "questioning about the status of my request for an accommodation, no reply was ever received." JA 660. "Instead" Lyons wrote, "I was told my employment was terminated." *Id.*

The district court erred in concluding that this language only "describes the alleged failure of the Hospital to respond to the plaintiff's request for accommodations" and not retaliation. JA 671. Rather, the charge form describes the heart of Lyons' first retaliation claim: that he was terminated shortly after his formal written request for an accommodation under the ADA. In fact, Lyons' inclusion of his "unlawful termination" in the EEOC charge could augment *only* his retaliation claim. Lyons' discrimination claim—that Hopkins failed both to engage in the interactive process and provide him with a reasonable accommodation—accrued well before Lyons was terminated, and his termination would not have been relevant to liability on his discrimination claim. Rather, the narrative on the EEOC charge—that he requested a reasonable accommodation and shortly after, in response to his request, Hopkins terminated him—makes out a retaliation claim on its face.

**3.** The charge language closely mirrors the description of retaliation in the EEOC's own guidance and regulations. Employees are protected from retaliation regardless of whether they are otherwise a "qualified individual" under the ADA. A retaliation claim requires taking an adverse action against an employee in response to

33

the employee engaging in activity protected by the ADA. A short period of time—
"days, or, in some cases, weeks"—between a plaintiff's protected activity and the
employer's adverse action strongly supports causation in a retaliation case. *Proving
Causation*, Employment Discrimination Law Ch. 15 IV.D.2. (Lindemann et. al eds., 5th
ed. 2012). An EEOC guidance document specifies that "[a] request for reasonable
accommodation of a disability constitutes protected activity under the ADA, and
therefore retaliation for such requests is unlawful." U.S. EEOC, Enforcement
Guidance on Retaliation and Related Issues 24 (Aug. 25, 2016).

And EEOC regulations set a low bar for what a charge must include, stating
that it "is sufficient when the Commission receives from the person making the
charge a written statement sufficiently precise to identify the parties, and to describe
generally the action or practices complained of." 29 C.F.R. § 1601.12; *see also Waiters v.
Robert Bosch Corp.*, 683 F.2d 89, 92 (4th Cir. 1982) (relying on EEOC regulations to
find a plaintiff's affidavit sufficient to constitute a charge and exhaust administrative
remedies where it "identified the parties, the nature of the discrimination, the date of
the discriminatory act and the circumstances supporting the charge").

The charge form here meets these EEOC requirements. Lyons' charge
adequately identifies the parties (Hopkins and specifically Heneberry) and describes
the action complained of—that he was unlawfully terminated shortly after making a
formal request for accommodations. JA 660. Both the causal language in his charge
("instead"), and the short period of only twenty days between Lyons' request for an

34

accommodation and his termination draw a clear causal connection between protected activity and adverse action. Both on its face and in light of the EEOC's guidance and regulations, Lyons' charge describes conduct constituting a retaliation claim sufficient to exhaust his administrative remedies.

**4.** The plain language of the charge is corroborated and supplemented by Lyons' answers to the EEOC questionnaire, which he filled out at the same time he filed his charge. Although this Court has held that it cannot consider claims made *only* in the EEOC intake questionnaire (and not in the charge form), *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407-08 (4th Cir. 2013), the Court has looked to the questionnaire to provide additional support for the allegations made in the charge, *see Sydnor*, 681 F.3d at 595-96. In *Sydnor* the Court relied heavily on the plaintiff's questionnaire to supplement the charge and found that, taken together, the documents afforded the defendant "ample notice of the allegations against it." *Id.* at 595. And in the years since *Balas*, this Court has continued to encourage looking to the questionnaire to support a charge's allegations. *See Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 669 (4th Cir. 2015) (citing *Sydnor*, 681 F.3d at 594).

Here, Lyons' answers to the questionnaire are consistent with the conduct recounted on the charge form and in his federal-court complaint, providing additional support that his charge intended to allege his retaliation claim. JA 618-21. In response to "[h]ow did your employer respond to your request [for a reasonable accommodation under the ADA]," Lyons answered, "no response, followed by letter

35

of termination." JA 620. By stating that his termination was a direct response by Hopkins to his request for an accommodation, Lyons' questionnaire resolves any doubt as to whether he intended to allege retaliation. The continuity between his answers to the questionnaire and language in the charge narrative further illustrates that Lyons viewed his termination as an unlawful (that is, retaliatory) response to his request for accommodations. And because his termination is not an essential element of his discrimination claim, his continued focus on his termination in the questionnaire further emphasizes Lyons' intent to allege retaliation to the EEOC.

**5.** Even if the charge is ambiguous as to the retaliation claim, the claim is nevertheless exhausted because it is closely related to the discrimination claim alleged in the charge form, which neither party disputes has been exhausted. As explained above (at 31), to exhaust, a claim need only relate to or grow out of the conduct alleged in the charge form. Here, the conduct alleged to support Lyons' first retaliation claim is not only related to, but overlaps with, the conduct alleged to support Lyons' initial discrimination claim. Both claims draw support from the conduct alleged in the charge—that Hopkins acted unlawfully by failing to consider Lyons' request for reasonable accommodations and denying him a reasonable accommodation, choosing ultimately to fire him rather than accommodate him. In sharp contrast to a charge that refers to "different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit," there is substantial overlap of the conduct and actors involved in the discrimination claim and

36

first retaliation claim. *See Chacko*, 429 F.3d at 506. In addition the plain language of the charge, this overlap is sufficient to exhaust the first retaliation claim.

**B.  Lyons exhausted his second retaliation claim that Hopkins submitted a complaint about Lyons to the Maryland Board of Social Work Examiners in retaliation for protected activity.**

Lyons exhausted his second retaliation claim for two independent reasons.

**1.** Lyons exhausted his second retaliation claim based on the complaint to the licensing board because it alleges related retaliatory conduct by the same actors whose conduct gave rise to his first retaliation claim based on his firing. Applying the general rule that a plaintiff may bring claims that are "reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation," this Court has found that claims are "reasonably related" for where "both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct." *Sydnor v. Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000) (internal quotation marks omitted)); *see Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981) (finding that claims alleging "discrimination in promotions" but involving different aspects of the "promotional system" were reasonably related).

The conduct alleged in Lyons' second retaliation claim meets that test; it involves different retaliatory conduct, a complaint to his licensing board, by the same supervisor who Lyons alleges terminated him in retaliation for engaging in protected activity. Lyons' supervisor, Heneberry, asked several times about when she could fire

Lyons, JA 516, 658, and ultimately did have human resources fire him for not

extending his leave, JA 653. Heneberry was also the person who filed a complaint

with the Maryland Board almost immediately after Hopkins confirmed with her that

Lyons was covered by the ADA. JA 274, 329, 657.

Lyons' situation is therefore comparable to the circumstances in *Smith*, where

the plaintiff's EEOC charge alleged that her employer retaliated by threatening to fire

her, but her complaint further alleged retaliation when her employer forced her to

work near her alleged sexual harasser and did not offer her certain other positions at

work. 202 F.3d at 248. This Court found these claims "reasonably related," and

therefore sufficiently exhausted, because they involved different conduct by the same

actor identified in the EEOC charge. *Id.* The same is true here. As in *Smith*,

Heneberry's additional retaliatory conduct—the complaint to the licensing board—is

sufficiently related to the retaliatory termination alleged in Lyons' charge form to

satisfy this Court's standard for exhaustion.

**2.** Lyons may also bring this retaliation claim because he could have reasonably

believed the complaint to the Maryland Board was retaliation for seeking

administrative remedies, including filing his EEOC charge, and that amending the

charge or filing a new one would invite further retaliation. In *Nealon v. Stone,* this

Court held that a plaintiff may bring a claim based on retaliation for filing an EEOC

charge for the first time in federal court without filing a new or amended charge. 958

F.2d 584, 590 (4th Cir. 1992). The Court explained that this holding was the

38

"inevitable corollary" of the general principle that "the scope of a Title VII lawsuit may extend to 'any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations'" in the charge. *Id.* (quoting *Hill v. Western Electric Co.,* 672 F.2d 381, 390 n.6 (4th Cir. 1982)). But the Court was also motivated by "practical concerns" that a "plaintiff will naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation." *Id.* (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989)). *Nealon* found that, under the circumstances of that case, the plaintiff's experience with the administrative process "did not improve her position the first time and would be unlikely to do so a second time," so she was "entitled to have her retaliation claim heard by the district court" despite not having filed a new charge. *Id.*

These practical concerns have led this Court to apply the rule in *Nealon* to circumstances "slightly different" from that case's specific facts. *Jones v. Calvert Grp.*, 551 F.3d 297, 304 (4th Cir. 2009); *see also Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 415-17 (4th Cir. 2014). For example, in *Jones*, this Court applied the reasoning in *Nealon* to a circumstance where, rather than "retaliation for filing the charge before the court," the plaintiff's claim was based on "a continuation of the retaliation she alleged in the charge." *Jones*, 551 F.3d at 304. This Court found "no reason why that distinction should make any difference" given that "the 'practical concerns' that we cited in *Nealon* as justifying excusing the plaintiff from filing an additional EEOC charge apply with equal force" to the specific facts in *Jones*. *Id.*

39

Here, there is sufficient evidence in the record to show that Lyons could have reasonably believed that the complaint was retaliation for engaging in the administrative process, including filing his EEOC charge. Lyons testified that he "did not know or learn exactly when Paula Heneberry made her report to the Maryland Board of Social Work Examiners about [him] until the discovery period in this case," but that he knew "an unspecified complaint had been made at least by May 22, 2013, when [he] was interviewed by a member of the Board staff." JA 624. This interview occurred just one week after Lyons had filed his EEOC charge on May 15, 2013. JA 618-21, 660. Only during discovery in the district court did Lyons learn that Heneberry had in fact submitted the complaint to the Maryland Board on March 19, six days after the Hospital confirmed to Heneberry that Lyons was protected by the ADA and well before Lyons submitted his EEOC charge.

Under these circumstances, Lyons could have reasonably believed the complaint was submitted in retaliation for engaging in the administrative process and filing his EEOC charge, and these circumstances would give rise to a reasonable fear of further retaliation. Hopkins could have, for example, continued to retaliate against Lyons even after firing him by sending additional information or complaints to the Maryland Board, further tarnishing his reputation and damaging any chance he had at maintaining his license and career. As in *Jones,* the practical concerns first announced in *Nealon* apply to the circumstances here, meaning that Lyons did not have to amend his charge or file an additional charge to bring his retaliation claim based on the

40

Maryland Board complaint. Therefore, Lyons may bring his second retaliation claim for the first time in court. *See Nealon*, 958 F.2d at 590.

### C. Lyons has demonstrated disputes of fact regarding whether Hopkins' reasons for its actions were pretext for retaliation.

After finding that Lyons had not exhausted his retaliation claims, the district court further held, in a one-sentence footnote, that summary judgment was also proper on the merits because Hopkins had provided a legitimate business reason for its actions and Lyons had not established that this reason was a pretext for retaliation. JA 672. This holding was incorrect.

A plaintiff may prove a retaliation claim "through the burden-shifting framework of *McDonnell Douglas*." *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To make out a retaliation claim using the burden-shifting framework, the plaintiff must first establish a prima facie case for retaliation. The burden then shifts to the employer to show that the alleged retaliation was in fact the result of a legitimate non-retaliatory reason. *Id.* at 250. Finally, the burden shifts back to the plaintiff to demonstrate "that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext'" for retaliation. *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). As discussed below, Lyons has established a prima facie case and offered sufficient evidence to create a dispute of fact about whether Hopkins' shifting reasons for firing and submitting a complaint about Lyons were pretext for retaliation.

41

**1.** To make out a prima facie case for retaliation, a plaintiff must show that (a) she engaged in protected activity; (b) her employer took adverse action against her; and (c) that a causal relationship existed between the protected activity and the adverse action. *Foster*, 787 F.3d at 250.

Each element is satisfied here. Lyons has well-documented, and historically well-managed, bipolar disorder that is a disability under the ADA. He engaged in protected activity by requesting reasonable accommodations for his disability and otherwise seeking the ADA's protections. JA 135-36, 270. Hopkins took adverse actions against Lyons by firing him and reporting to the Maryland Board that he had an untreated substance-abuse problem. JA 274, 427-28, 652.

Finally, Lyons' discharge occurred under circumstances that demonstrate a causal relationship between his protected activity and the two adverse actions. First, the temporal proximity between when Lyons requested to return to work with accommodations and when he was fired—twenty days—is evidence that Johns Hopkins retaliated against Lyons for his request. JA 270, 653. Lyons has also demonstrated temporal proximity—six days—between Heneberry's complaint to the Maryland Board and when the hospital confirmed to Heneberry that Lyons was covered by the ADA and that, therefore, the hospital would need to engage with Lyons' requests for accommodation before firing him. JA 274, 329, 657. Although temporal proximity "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality."

42

*Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). This Court has held that evidence that an employee was "fired just three weeks after sending her e-mail disclosing her disability and requesting an accommodation" was "such close temporal proximity [to] weigh[] heavily in favor of finding a genuine dispute as to causation." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 575 (4th Cir. 2015). Here, the short time periods at issue in each claim, twenty days and six days, are sufficient to establish the causation element of the prima facie case.

In addition to temporal proximity, the record shows that both the complaint and Lyons' termination occurred under circumstances that suggest unlawful retaliation. Lyons communicated to Heneberry that he has a disability and requested accommodations under the ADA several times early in his employment. JA 134-38, 240. In one of these conversations, Heneberry told Lyons not to request an accommodation because he would be "making trouble." JA 135. When Johns Hopkins extended his medical leave, Heneberry asked why his leave had been extended without her input because she had planned to terminate Lyons when his leave ended. JA 473. Despite acknowledging that Hopkins had extended his leave, Heneberry repeatedly expressed her desire to fire Lyons for not extending his leave. JA 474, 516, 658. Davis, the benefits specialist at Hopkins, explained directly to Heneberry that Lyons is protected under the ADA and that "he can't be term[inated] until we reach out to him to determine his intent to return." JA 657. In the same

43

email, Davis explained that if Lyons requested an accommodation then Hopkins would "have to see if he can be accommodated before he can be term[inated]." *Id.* Shortly after that discussion, Heneberry submitted the complaint to the Maryland Board. JA 329. Using forms mailed to him by Davis, Lyons formally requested accommodations that would allow him to return to work, and yet two weeks later he was terminated for failing to extend his leave. JA 207. These circumstances are sufficient to suggest that Heneberry submitted the complaint and Hopkins fired Lyons in response to his request for accommodations and used the failure to extend his leave as an excuse for his termination.

**2.** Once Lyons has established the prima facie case, the burden shifts to the defendant to demonstrate a legitimate reason for its adverse action. *Foster*, 787 F.3d at 250. Hopkins has articulated various reasons, none convincing. Failure to show up to work, as inferred from the termination letter and as discussed in internal communications, may (of course) be a legitimate reason for firing an employee in some circumstances. However, in this litigation, Hopkins stated that its reason for firing Lyons was drug use and noncompliance with Hopkins' drug treatment recommendations, ECF 46-1, at 44, recommendations Lyons was never told were mandatory. JA 181. Likewise, in litigation, Hopkins has also explained that the complaint to the Maryland Board was filed due to Lyons' drug use. ECF 46-1, at 38.

Hopkins' shifting and post-hoc reasons are themselves evidence of pretext. As this Court has explained, an employer's offer of "different justifications at different

44

times for" taking action against an employee "is, in and of itself, probative of pretext." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001). This Court is suspicious "not only when an employer provides different explanations at different times, but also when the explanations appear inconsistent.*" Fox v. Leland Volunteer Fire/Rescue Dep't, Inc.*, 648 F. App'x 290, 294 (4th Cir. 2016). This suspicion is particularly salient when the new justification arises in litigation, because "a factfinder could infer from the late appearance of [the employer's] current justification that it is a post-hoc rationale, not a legitimate explanation." *Sears Roebuck*, 243 F.3d at 853.

On top of this, ample additional evidence shows Lyons' supervisors grasping for reasons to fire him. These facts illustrate a genuine dispute for the jury about whether Hopkins' reasons for firing and submitting a complaint about Lyons are pretext. Lyons' supervisors were aware that Lyons was covered by the ADA and that, when Lyons requested reasonable accommodations, Hopkins could not fire Lyons without first trying to facilitate his return to work. JA 473, 657-58. But when Lyons requested to return to work with reasonable accommodations, Heneberry reacted: "We are not starting from scratch with him are we??? Why aren't we terminating him for lack of compliance within the stated time frame of approved health leave and benefits??" JA 516. In that same discussion, Glicksman clarified that his Faculty and Student Assistance Program "has nothing to do with whether a client is hired or fired.*" Id.* Two days later, Johns Hopkins terminated Lyons for failing to extend his leave—precisely the reason that Heneberry kept suggesting and Davis explained was

prohibited by the ADA. It was not until its motion for summary judgment that Hopkins began to rely on Lyons' drug use to justify its actions, which itself demonstrates that Hopkins' initial reason for termination, Lyons' supposed failure to extend his leave, was pretext.

Regarding the second retaliation claim, there was a close temporal proximity between the complaint to the Maryland Board and when Hopkins confirmed to Heneberry that the Hospital would have to consider Lyons' request for accommodation because he was covered by the ADA. This strongly suggests that Heneberry's stated reasons for submitting the complaint were pretext for retaliating against Lyons now that she knew Lyons was protected by the ADA. *See Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 758 (4th Cir. 1986) (finding that close temporal proximity can raise an inference of pretext). In addition to temporal proximity, the records shows that Heneberry knew of only one positive drug test four months prior, and that Glicksman and Koelsch told her that Lyons was receiving treatment. JA 655-56. But she nonetheless submitted a complaint days later stating that there was no evidence of ongoing compliance with a treatment program and that she feared Lyons had an active substance-abuse problem. JA 330-31, 427-28.

For these reasons, Lyons has demonstrated a genuine dispute of material fact about whether Johns Hopkins provided a legitimate business reason for firing and submitting a complaint against Lyons, and whether its stated reasons were pretext for retaliation in response to his requests for accommodations. The district court's grant

46

of summary judgment should therefore be reversed and the case remanded for a trial on the merits of Lyons' retaliation claims.

**CONCLUSION**

This Court should reverse the district court's decision and remand to the district court for trial.

Respectfully submitted,

<u>s/Wyatt G. Sassman</u>

| | |
|---|---|
| Lisa Bender | Wyatt G. Sassman |
|   Student counsel | Brian Wolfman |
| Anna Deffebach | Georgetown Law Appellate Courts |
|   Student counsel |   Immersion Clinic |
| Hali Kerr | 600 New Jersey Ave., NW |
|   Student counsel | Washington, D.C. 20001 |
| | (202) 661-6582 |
| | wyatt.sassman@georgetown.edu |
| | *Counsel for Appellant* |

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument. The decisional process will be aided by oral argument, which would allow the Court, among other things, to explore the circumstances under which an employer has acted "on the basis" of an employee's drug use under 42 U.S.C. § 12114(a), which this Court has never done. Oral argument will also allow this Court to explore the circumstances under which an ADA claimant exhausts the EEOC administrative process.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated using Microsoft Word 2013. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Garamond, a proportionally spaced typeface with serifs.

s/Wyatt G. Sassman
Wyatt G. Sassman
Georgetown Law Appellate Courts
 Immersion Clinic
600 New Jersey Ave., NW
Washington, D.C. 20001
(202) 661-6741
wyatt.sassman@georgetown.edu
*Counsel for Appellant*

# STATUTORY ADDENDUM

**42 U.S.C.A. § 12114 – Illegal use of drugs and alcohol**

(a) Qualified individual with a disability
For purposes of this subchapter, a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

(b) Rules of construction
Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who--

(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

(2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or

(3) is erroneously regarded as engaging in such use, but is not engaging in such use;

except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

*    *    *

1A

## CERTIFICATE OF SERVICE

I certify that on May 8, 2017, I electronically filed this Brief of Appellant Ian Lyons using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users: appellee Johns Hopkins Hospital's attorney of record, Jay Robert Fries (jfries@fordharrison.com).

<u>s/Wyatt G. Sassman</u>
Wyatt G. Sassman
Georgetown Law Appellate Courts
  Immersion Clinic
600 New Jersey Ave., NW
Washington, D.C. 20001
(202) 661-6741
wyatt.sassman@georgetown.edu
*Counsel for Appellant*